**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

JOSE CALDERO, ANNABELLE G.
GERONIMO a/k/a ANNABELLE G. LEVIEN, and
YAMILET SALTY, individually and on behalf of all
others similarly situated

         Plaintiffs,

    - against -

MTGLQ INVESTORS, L.P.; SELENE FINANCE,
L.P.; NATIONSTAR MORTGAGE LLC; FEDERAL
NATIONAL MORTGAGE ASSOCIATION;
ANSCHUTZ, SCHNEID, CRANE & PARTNERS,
PLLC a/k/a RAS BORISKIN LLC; JOHN AND
JANE DOE INVESTORS 1-10; and JOHN AND
JANE DOES 1-10,
         Defendants.
-----------------------------------------------------------------X

Index No.:

**CLASS ACTION**
**COMPLAINT**

**Jury Trial Demanded**

**FILED VIA ECF**

    Plaintiffs Jose Caldero, Annabelle G. Geronimo a/k/a Annabelle G. Levien and Yamilet Salty, individually and on behalf of all others similarly situated (hereinafter "Plaintiffs") on behalf of themselves and all others similarly situated, for their complaint, allege upon personal knowledge as to themselves and information and belief as to other matters, as follows:

<u>**INTRODUCTION**</u>

    1.   This action alleges that mortgage lenders, the loan servicing agents that service loans and the attorneys that prosecute foreclosures in New York have engaged in a pattern of conduct that intentionally and fraudulently inflates the amount of judgment post-foreclosure sale. The Defendants are alleged to have conspired to systemically insert false figures into the pro-forma judgments of foreclosure and sale and the reports of sale that are reported by the foreclosing referee and confirmed by the Court.

    2.   In the wake of the Great Recession in 2008, which caused widespread

foreclosures and brought the lending industry to a halt, those that acted on behalf of the banks (i.e. their attorneys) were thriving. Many cut corners to be the most affordable attorneys and to attract business. One such firm was the notorious Steve Baum, P.C., which is now defunct in the wake of rampant fraud and a New York Times exposé.[1] Almost every foreclosure case resulted in dismissal because the underlying evidence used to establish assignments of the note and mortgage were deemed fraudulent. The firm disbanded and became a series of other firms or other firms filled the void left by Baum's exit. These firms include: Mccabe Weisberg & Conway LLC,[2] RAS Boriskin LLC, Rosicki, Rosicki & Associates, P.C.,[3] Robertson, Lambert, Weiss, Weisman & Gordon, LLP, Shapiro, DiCaro & Barak, LLC, Davidson Fink LLP, Leopold & Associates, PLLC, David A. Gallo & Associates LLP. Many staff attorneys from Steven J. Baum's firm still work in the industry and are principals of the above-mentioned law firms. Many of these firms have been involved with some form of impropriety in the years that followed, which could be as small as not having the required documents to foreclose or, in some instances, completely making things up.

3.      The state and federal government enacted numerous protection statutes that require foreclosing mortgagees to provide delinquent homeowners additional preforeclosure notices and require affirmations from attorneys to attest to the veracity of the documents being submitted in court at all stages of the litigation. *See e.g.* REAL PROP. ACTS. §§ 1303, 1304, 1307, 1308. Due to these heightened requirements, thousands of mortgages became uncollectible because certificateholders, servicers, and their attorneys simply could not or would not produce

---

[1] Peter Lattman, Foreclosure Firm Steven J. Baum to Close Down, THE NEW YORK TIMES (November 21, 2011, 2:51 PM), https://archive.nytimes.com/dealbook.nytimes.com/2011/11/21/foreclosure-firm-steven-j-baum-to-close-down/

[2] Jon Hill, Loan Servicer Sues McCabe Weisberg for Lost Foreclosure, LAW360 (August 31, 2018, 9:13 PM), https://www.law360.com/articles/1079004/loan-servicer-sues-mccabe-weisberg-for-lost-foreclosure

[3] Complaint-in-Intervention, *United States of America* ex rel. *Peter D. Grubea, v. Rosicki, Rosicki & Associates, P.C.,* et. al., No. 1:12-cv-07199-JSR (S.D.N.Y. March 27, 2018), ECF No. 22.

the required proof in admissible form sufficient to prosecute a foreclosure case.

4.      In an attempt to sidestep these new heightened requirements and to save on the increased costs and diligence required to prosecute a foreclosure, banks and their attorneys began using the courts as a tool to perpetually delay foreclosure cases through dilatory conduct and voluntary dismissal and re-starts.[4] This tactic came to a head in the infamous *Freedom Mortgage v. Engel*, decision from the New York Court of Appeals, wherein the Court decided in a 4-3 decision and in the face of contrary decisions from multiple New York Appellate Divisions that most of the previously uncollectible mortgages could now be collected.[5]

5.      On December 30, 2022, the New York Governor signed into law the Foreclosure Abuse Prevent Act (FAPA), whereby the New York State Legislature legislatively overruled *Engel* on the basis that it, and similar cases, evidenced a complete disregard of existing case law and the plain language of the law. The legislature, in the Sponsor's Memo to the bill that would become FAPA, states the following:

> "The aim of [FAPA] is to thwart and eliminate abusive and unlawful litigation tactics that have been adopted and pursued in mortgage foreclosure actions to manipulate the law and judiciary to yield to expediency and the convenience of mortgage banking and servicing institutions."

Assembly Mem In Support of 2022 Assembly Bill A7737B, L2022, ch 821.

6.      The New York Legislature intervened to thwart the abusive, unlawful, and fraudulent conduct by lenders, servicers and their attorneys. The misconduct complained of herein was recognized in 2013 by the Office of the State Comptroller, Division of State Government Accountability.

---

[4] Mark Anderson & Andrew Fisher, *Bank of N.Y. Mellon v. Slavin: How the Third Department Has Created a Never-Ending Foreclosure Case Using the "Savings Statute" CPLR 205*, 48 N.Y. REAL PROP. L. J. 21, 21 (explaining how lenders previously utilized CPLR § 205 to revive a foreclosure action's statute of limitations).
[5] *Freedom Mortg. Corp. v. Engel*, 37 N.Y.3d 1 (N.Y. 2021), *superseded by statute*, Foreclosure Abuse Prevention Act, L 2022 ch 821.

7.      One such example is the lack of appropriate judicial oversight in the post-auction foreclosure process in the state of New York. In the OSC-GAO audit report, it was reported that from a sample of ten foreclosure cases throughout the state, nine of the referee's reports of sale were inaccurate.[6]

8.      Moreover, a string of appellate decisions have reversed judgments of foreclosure and sale by revealing inaccuracies, overcharges, phantom charges and a lack of evidence in admissible form to substantiate the dollar amount of the judgments of foreclosure and sale.

9.      Despite these findings, no action has been taken by the judiciary or the legislature to investigate and remedy the systemic and endemic failures in the foreclosure process that permeate and corrupt the computation of amounts due at judgment, for the amounts of surplus monies and deficiencies. This complacency has led to widespread theft of homeowner funds by lenders, their servicers, and their attorneys that act under the color of law.

10.     This action alleges widespread, systematic fraud and theft that has been purposefully perpetrated upon homeowners, their creditors, the judiciary, and the public. It is a crisis that has been hiding in plain sight. There can be no uncertainty here: certain lenders, their servicers, and their attorneys are working in a coordinated manner to steal from distressed homeowners, their creditors, those holding subordinate claims to the first mortgage, and the Local, State, and Federal government. This action and the others that will follow seek monetary judgment and injunctive relief, hoping to provide a solution.

## NATURE OF THE CASE

11.     The Plaintiffs bring this action on behalf of themselves and a class of similarly

---

[6] State of New York Office of the State Comptroller, Division of State Government Accountability, Reporting on Foreclosure of Real Property Funds – Kings County [2013-S-2, December 12, 2013].

situated New York Residents challenging the fraudulent and deceiving practices of MTGLQ INVESTORS, L.P.; SELENE FINANCE, L.P.; NATIONSTAR MORTGAGE LLC; ROBERTSON; FEDERAL NATIONAL MORTGAGE ASSOCIATION; ANSCHUTZ, SCHNEID, CRANE & PARTNERS, PLLC a/k/a RAS BORISKIN LLC; JOHN AND JANE DOE INVESTORS 1-10; and JOHN AND JANE DOES 1-10 (hereinafter the "Defendants" collectively), who have collectively engaged in a fraudulent scheme to purposefully miscalculate interest due and owing on residential mortgages in order to obtain vastly inflated payouts from court-ordered foreclosure sales which, in turn, deprived Plaintiffs and class members of their legal right to be awarded surplus monies resulting from said sales.

12.    Defendants facilitate this scheme by submitting deceptive documentation to New York Courts in the hopes that court personnel and court appointed individuals will blindly approve and sign them as a rubber stamp. With these deceptive filings, the Defendants' unlawfully obtain foreclosure surplus monies from homeowners, creditors, and others entitled to foreclosure auction surplus monies.

13.    Upon information and belief, Defendants Selene Finance, L.P. (hereinafter "Selene" or "Selene Finance") and John and Jane Doe Investors 1-10, coordinate with Defendant Robertson, Anshutz, Schneid, Crane and Partners, PLLC a/k/a RAS Boriskin, LLC (hereinafter "Robertson Anschutz" or "Robertson") to draft and review these deceptive documents with the intention, understanding or objective to prematurely utilize the final monetary judgment award to the noteholders, Defendant MLGTQ Investors (hereinafter "MLGTQ"), Defendant Nationstar Mortgage LLC (hereinafter "Nationstar Mortgage") and Defendant Federal National Mortgage Association (hereinafter "Fannie Mae"), awarded in a court's Judgment of Foreclosure and Sale (hereinafter the "JFS") in calculating improper compound interest accrued on a mortgage loan

before the JFS was actually entered in violation of CPLR §§ 5001, 5002, 5003 and N.Y. General

Obligation Law § 5-527.

14.     More specifically, Plaintiff has found that MLGTQ, Selene Finance, Nationstar

Mortgage, Fannie Mae and Robertson Anschutz have purposefully and unlawfully submitted pre-

drafted referee's reports of sale in state and/or federal courts that charge unlawful, compound

interest that vastly inflates the amounts owed to the foreclosing plaintiffs. The pre-drafted

referee's report charges compound interest from the time between Robertson filing a motion for

the entry of a JFS and the actual granting and entry of the JFS by the court (the "Motion

Determination Period"). MLGTQ, Selene Finance, Nationstar Mortgage, Fannie Mae and

Robertson Anschutz use the already-determined JFS amount as the basis for the calculation of

interest in the Motion Determination Window instead of using the legal basis of the mortgage

principal. In some instances, the difference in the purported judgment and the proper judgment

are well in excess of one hundred thousand dollars.

15.     There is no uncertainty here: the Defendants have systematically stolen from the

Plaintiff and all others that are entitled to surplus monies in this matter and have used the color of

law to achieve this goal. The Plaintiff is not alone. This is a widespread crisis caused by nothing

more than greed.

## JURISDICTION AND VENUE

16.     Defendants conduct business in the State of New York, and Defendants' fraud

upon Plaintiff was coordinated in this District. Venue is proper in this District.

17.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 & 1337, and

under 15 U.S.C. § 1692k(d).

18.     This Court has jurisdiction under 28 U.S.C. § 1332(c) as there is complete

6

diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.00.

19.       This Court has jurisdiction over the New York state law claims pursuant to 28 U.S.C. § 1367.

20.       This Court also has jurisdiction over all the claims under 28 U.S.C. § 1332(d), the Class Action Fairness Act of 2005 ("CAFA"), in that "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs, and is a class action in which . . . any member of a class of plaintiffs is a citizen of a state different from any defendant."

## PARTIES

### I.   PLAINTIFFS

21.       Plaintiff Jose Caldero (hereinafter "Plaintiff Caldero" or "Mr. Caldero") is an individual residing in the state of New York, Queens County. Mr. Caldero is a consumer as that term is defined by 15 U.S.C. § 1692a(3). Defendants initiated and maintained at least one action against Mr. Caldero alleging claims related to consumer debt.

22.       Plaintiff Annabelle G. Geronimo a/k/a Annabelle G. Levien (hereinafter "Plaintiff Levien" or "Ms. Levien") is an individual residing in the state of New York, Queens County. Ms. Levien is a consumer as that term is defined by 15 U.S.C. § 1692a(3). Defendants initiated and maintained at least one action against Ms. Levien alleging claims related to consumer debt.

23.       Plaintiff Yamilet Salty (hereinafter "Plaintiff Salty" or "Ms. Salty") is an individual residing in New York, Kings County. Ms. Salty is a consumer as that term is defined by 15 U.S.C. § 1692a(3). Defendants initiated and maintained at least one action against Ms. Salty alleging claims related to consumer debt.

## II.    DEFENDANTS

24.    Defendant MLGTQ is a Delaware limited partnership that conducts business in the State of New York and regularly attempts to collect debts alleged to be due to another.

25.    Defendant Nationstar Mortgage LLC is a Texas limited liability corporation that conducts business in the State of New York and regularly attempts to collect debts alleged to be due to another.

26.    Defendant Fannie Mae is a government-sponsored enterprise headquartered in Washington, D.C. and doing business in the state of New York. Fannie Mae regularly attempts to collect debts alleged to be due to another.

27.    Defendant Selene Finance is a Texas limited partnership that does business in New York and regularly attempts to collect debts alleged to be due to another.

28.    Defendant Robertson Anschutz is a Florida professional limited liability corporation with its principal place of business located at 6409 Congress Ave, Suite 100, Boca Raton, FL 33487. Robertson Anschutz has been retained by MLGTQ and Nationstar Mortgage LLC to collect on consumer debt that MLGTQ and Nationstar Mortgage LLC claim to own. Pursuant to those retentions, Robertson Anschutz files and maintains actions in New York State courts seeking debt collection. As part of the filing of each such case, Robertson Anschutz, as it is obligated to do under New York State law, includes a certification pursuant to Rules of the Chief Administrator of the Courts (22 NYCRR) § 130-1.1a.

29.    The John and Jane Doe Investors 1-10, whose name and identities are unknown to Plaintiff and such names being fictitious, are individuals who invest in mortgage trusts and notes. Upon information and belief, each of the John and Jane Doe Investors 1-10 are citizens of a jurisdiction different than the State of New York.

30.     The John and Jane Does 1-10, whose name and identities are unknown to Plaintiff and such names being fictitious, are individuals who served or currently serve in management roles with decision-making authority at Robertson Anschutz. Upon information and belief, each of the John and Jane Does 1-10 are citizens of a jurisdiction different than the State of New York.

## FACTS

### I.    HOW THE FORECLOSURE PROCESS WORKS IN NEW YORK STATE

#### a.   *The Participants to the Fraud*

31.     There are four key "participants" who propel the foreclosure process.

32.     The first player is the entity that holds the original mortgage note and agreement and, as such, has standing to commence a foreclosure action. These entities are oftentimes referred to as the "noteholders" and serve as the plaintiffs in their respective foreclosure actions. Typically, as can be seen in Plaintiff's case herein, noteholders are often comprised of trusts and other institutions which are assigned a note and mortgage from the original lender. In the instant matter, MLGTQ Nationstar Mortgage and Fannie Mae are the noteholders.

33.     The second player is the mortgage servicing agent. A mortgage servicing agent or company is the entity that manages individual loans for the noteholder. These mortgage servicers keep track of payments, issue notices, implement late fees and perform other services necessary to maintain a mortgage agreement. In a foreclosure action, mortgage servicers will submit sworn affidavits from officers or managing members attesting to the specific facts of the foreclosure case, such as the outstanding balance on the loan and how much interest has accrued. Importantly, it is the mortgage servicer, not the plaintiff, who submits calculations and ledgers to the court outlining how much is due on any given loan. In the instant matter, Selene Finance,

L.P. and Nationstar Mortgage LLC are the mortgage servicing agents.

34.    The third players are the law firm and their partners, associates and office personnel with decision making authority. Law firms representing noteholders seeking to foreclose on a mortgage note, review and submit all documentation to the court. Upon information and belief, law firms for foreclosure plaintiffs work with both the noteholders and mortgage servicing agents to draft necessary documents and produce reports of how much is due and owing on the mortgage agreement. In the instant matter, Robertson Anschutz is the law firm.

35.    The fourth player is the investor. The investors are the ultimate beneficiary of the loan. Upon information and belief, these investors have substantial decision-making authority in every aspect of how the loan is serviced, prosecuted, and eventually collected.

### b.  The Process

36.    To understand Defendants' illegal conduct in this matter, one must understand the basic mechanics of the foreclosure process:

    i.    Once a borrower defaults on her mortgage payments and is sent the requisite 90 Day Pre-Foreclosure Notice required by New York's Real Property and Proceedings Law ("RPAPL") Section 1304, a noteholder may commence a court case against the borrower to foreclose on the mortgage agreement.

    ii.    A foreclosure action is formally begun when the noteholder files a summons and complaint, which alleges, *inter alia*, the principal balance owed on the mortgage loan and the date of an alleged default.

    iii.    Depending on whether the borrower formally appears and answers the summons and complaint, the law firm then typically files a motion for summary judgment or default judgment and simultaneously asks for an order of

reference. If granted, the matter is referred to a court-appointed referee to calculate the amounts owed on the mortgage, plus any costs and fees.

iv.  The court-appointed referee then files a report outlining the amounts due and owing on the outstanding mortgage either up to the date the report is filed with the court or soon before (the "Referee's Report").

v.  After this report is provided to the law firm, the noteholder must make a motion to confirm the Referee's Report and for a judgement of foreclosure and sale. In this motion, the noteholder, oftentimes through its servicing agent and attorney, attests to reviewing all relevant documents and their accuracy. There are a few points to note about these motions and how law firms typically prepare one:

- Law firms draft, review and submit all portions of this motion, including an attached proposed order granting the relief the plaintiff is seeking from the court. Upon information and belief, these proposed orders are typically drafted from templates the law firms have on file and are rarely reviewed by an attorney.

- Notably, these proposed orders award a judgment amount matching the one provided on the Referee's Report and state to compute interest on this judgment amount at the mortgage note rate from the date the Referee's Report was issued, not the date the judgment was actually entered by the court.

vi.  The presiding judge then makes a determination on the noteholder's motion and, if the motion is granted, signs off on the proposed order submitted by the law

firms and enters the judgment of foreclosure and sale. It should be noted that in a majority of foreclosure cases, the court merely signs the bottom of the proposed order submitted by the law firms and makes no adjustments. Once the judgment of foreclosure and sale is entered, the noteholder can then proceed to auction the real property encumbered by the mortgage.

vii.    The noteholder and court personnel then arrange for a public auction to be held by the court-appointed referee and, on a sale date scheduled by the court, the encumbered property is either sold to the highest bidder or, in some instances, to the noteholder itself.

viii.   The winning bidder, thereafter, remits a down payment of ten percent of the purchase price to the referee and schedules a final closing date. At the closing, the winning bidder remits the remainder of the purchase price to the court-appointed referee, and the deed to the foreclosed property is conveyed to the winning bidder.

ix.    For the final step, the court-appointed referee issues a Referee Report of Sale, wherein the referee reports that the foreclosed property was sold, how much it was sold for, how much is owed to the noteholder and how much, if any, surplus monies remain.

x.    If there are surplus monies, creditors of the borrower are permitted to file proofs of claim and, if approved by the referee, some or all of the surplus monies are distributed to those creditors that file a claim.

xi.    If, after any creditors entitled surplus have received their distribution of the surplus, there remains surplus monies, these remaining monies are paid to the

borrower, their estate or their assignee.

xii.    After all the proceeds from the sale are allocated and released to the appropriate parties, the foreclosure action concludes, and the referee is discharged of her duties.

### c.  *The Interest Calculations*

i.  <u>*Background on Interest*</u>

37.    New York's Civil Practice Laws and Procedures ("CPLR") permits interest to accrue during the pendency of any action seeking a monetary award. Sections 5001, 5002, 5003 and 5004, of the CPLR set the rules governing when interest begins to accrue, how much interest is permitted to accrue, and how said interest is to be computed during the various stages of litigation. Additionally, compound interest is generally prohibited from being applied in residential foreclosure actions under N.Y. Gen. Oblig. Law § 5-527.

38.    New York Practitioners and legal scholars have, for the purposes of simplifying the topic's rhetoric, divided the accrual of interest during the pendency of a proceeding into three periods: Category I interest, Category II interest and Category III interest. *See* David D. Siegel, NEW YORK PRACTICE § 411 (6th ed. 2024); Hon. Mark C. Dillon, Practice Commentary, MCKINNEY'S CONS. LAW OF N.Y., 2023 Electronic Update, CPLR. § 5002. In simple terms, the categories of interest are as follows:

•    Category I interest is the interest accrued on the cause of action from the time it accrues until the time of verdict, decision or judgment. *See* Mark C. Dillon, Practice Commentary, MCKINNEY'S CONS. LAW OF N.Y., 2023 Electronic Update, CPLR. § 5002; *see* CPLR. § 5001.

•    Category II interest is the interest accrued between the time a decision or

verdict is rendered and the entry of a final judgment. *See id.*; *see also* CPLR § 5002. This category is typically irrelevant in foreclosure actions, unless there is a trial.

- Category III interest is the interest that accrues upon a judgment from the date of its entry until it is paid. *See id.*; *see* CPLR § 5003.

39.     Unless an exception applies, the statutorily set interest rate of nine percent is applied to both Category II and Category III interest. *See* CPLR § 5004. Since a foreclosure action is one born out of contract, New York Courts mandate prejudgment interest to be calculated at the contractual rate rather than the statutory rate. *NYCTL 1998-2 Trust v. Wagner*, 61 A.D.3d 728, 729 (2d Dep't 2009); *Marine Mgt. v. Seco Mgt.,* 176 A.D.2d 252, 253 (2d Dep't 1992), *affd.* 80 N.Y.2d 886.   As such, Category I interest in a foreclosure action is typically calculated at the rate specified in the mortgage agreement. *NYCTL 1998-2 Trust*, 61 A.D.3d at 729.

40.     The timing of when and how certain rates of interest apply is equally as important as the rates of interest themselves. CPLR § 5001(c) states, in relatively plain terms, "[t]he amount of interest shall be computed by the clerk of the court, to the date the verdict was rendered or the report or decision was made, and included in the total sum awarded." In other words, Category I interest is applied up until the date of a verdict, report or decision. Thereafter, Category II and III interest takes over. It is crucial to note that a special referee's report with recommendations only, rather than a final verdict or determination, is not considered a "verdict, report or decision" under CPLR § 5001. *See Board of Managers of 25th Charles St. Condo v. Seligson*, 126 A.D.3d 547, 548-549 (1st Dep't 2015) (citing *Matter of East Riv. Land Co.*, 206 N.Y. 545, 549 (N.Y. 1912); Weinstein–Korn–Miller, NEW YORK CIVIL PRACTICE, ¶ 5002.03 (2d

14

ed. 2014)). In such cases with a special referee, Category I interest runs until the date the court confirms the referee's report, not the date of the referee's report itself. *See id.* at 548-549 ("When, as here, a court orders a special referee to hear and report with recommendations, interest pursuant to CPLR 5002 runs from the date the court confirms the Referee's report, not the date of the report"). Once a court enters a decision confirming the referee's report, then Category II and III interest applies.

ii.    *How Interest Should be Computed in Foreclosure Actions*

41.    When applying the above rules to a mortgage foreclosure action, calculating the interest owed at the conclusion of the action is relatively simple.

42.    From the date of the commencement of the action until the date a court confirms the referee's report of amounts due and enters a judgment of foreclosure and sale, Category I interest accrues, and interest is computed via a simple interest calculation utilizing the rate of interest in the mortgage agreement.

43.    After a court issues a decision confirming the referee's report and entering a judgment of foreclosure and sale, Category III interest accrues, and interest is computed at the statutory interest rate of nine percent on the final judgment amount entered by the court. This interest accrues until the mortgage principal is satisfied, either via a sale of the secured property or by other means.

44.    As discussed *supra*, in the New York State Court System, there is often a significant gap of time between the date a referee issues her report and the date a court enters a decision confirming said report and a judgment of foreclosure and sale. This is because a plaintiff, after the referee issues her report, must move the court to confirm this report and enter a judgment of foreclosure and sale. As such, between the date of the referee's report and the date a

final judgment of foreclosure and sale is entered, Category I interest still accrues. This gap of time, however, is oftentimes not accounted for in a court's confirmation of the referee's report and final judgment, as the court has only been moved to confirm the report up until the date it was issued.

45.     To properly account for this gap (hereinafter the "Motion Determination Period"), the party calculating interest at the conclusion of a foreclosure action must calculate the simple interest accrued on the principal (i.e. Category I interest) during the Motion Determination Period. This is because a final judgment has not yet been entered in the action during this time period. As such, a party cannot collect compound interest on a sum that has not yet been determined as actually due and owing to them.

46.     The party then must calculate the statutory interest owed on the confirmed judgment amount from the date of the judgment of foreclosure and sale until the principal is satisfied (i.e. Category III interest). These two amounts then add up to the total interest owed on the outstanding mortgage principal. It should be noted that Category II interest does not typically get applied in foreclosure actions which are decided summarily. This is because, when issuing a decision on a motion, a court will issue a decision and have it be entered on the same day. As such, there is no gap between the decision of the court and the entry of that decision, and Category II interest is not implicated

**(Remainder of page left intentionally blank)**

47.     See below for a visual outlining how interest should be computed during the life of a foreclosure action:



## II.     THE DEFENDANTS' SYSTEMATIC THEFT OF SURPLUS MONIES

48.     The situation Plaintiff complains of is as follows:

49.     A court-appointed referee issues a Referee's Report of the amounts owed by a borrower on a mortgage loan. This report, understandably, only computes interest up until the date the report is actually issued. Therefore, the Referee's Report recommends that a court enter

a judgment confirming that the plaintiff is owed the computed amount as of the date of the Referee's Report.

50.     The law firms then move the court to confirm the Referee's Report and issue a Judgment of Foreclosure and Sale. These law firms, however, draft and submit proposed orders attached to these motions which include language awarding illegal compound interest to the noteholders. The law firms, through the façade of legitimacy, treat the Referee's Report as if it is the court's own judgment awarding monies to the noteholders and direct that interest be computed on the final judgment award from the date the Referee's Report was issued.

51.     The issue with such a practice is two-fold.

52.     First, law firms are treating the Referee's Report as if it is a final money judgment or order under CPLR § 5003, and improperly computing interest thereon from the date the report is issued. However, the Referee's Report is merely a recommendation to the court of what amounts should be paid to a noteholder in the event a Judgment of Foreclosure and Sale is entered. This characterization of the Referee's Report is not only evident in New York case law, as discussed *supra*, but is evident from the foreclosure procedure itself; even after a Referee's Report is issued, noteholders must still move the court to confirm said report. If judicial review and confirmation were not necessary, and a Referee's Report alone served as a judgment, then such a motion would not be required.

53.     Second, law firms are knowingly fabricating a method of computing interest entirely unsupported by the CPLR and New York State law while purporting it to be logical. For instance, if law firms were (1) mistakenly construing the Referee's Report as a final judgment under CPLR § 5003 or (2) considering the Motion Determination Period at the time between a final report and entry of judgment under CPLR § 5002, which would entitle the noteholders to

18

the statutory interest rate of 9%. Such constructions, while still improper, would nontheless have some basis in the CPLR. However, law firms are crafting proposed orders to state that interest is to be computed at the rate provided for in the original mortgage loan agreements, rates which are oftentimes much lower than 9%. Furthermore, law firms know that noteholders are entitled to statutory interest because at the conclusion of a foreclosure case, law firms submit documentation calculating interest from the date of the entry of the Judgment of Foreclosure and Sale as 9%.

54.    Finally, as further evidence of the law firms' fraudulent intentions, upon information and belief, these law firms instruct their attorneys and employees to calculate interest via the fraudulent method described herein. Specifically, law firms utilize pre-written and approved manuals containing step-by-step guides on how to calculate interest and amounts owed in foreclosure actions. These instruction manuals are to be followed by every employee and agent of said law firms.

55.    It can only be deduced that law firms, along with noteholders and mortgage servicing agents, are knowingly submitting proposed orders to courts which they know will superficially appear to be correct and lawful. These law firms, being specialized and experienced in plaintiff-side foreclosure litigation, know that such documentation will not be scrutinized at the level required to uncover their deceit. The noteholders and mortgage servicing agents reap the rewards of this crafty deception by receiving tens of thousands of dollars more than they would be owed if interest had been computed correctly. Most egregiously, borrowers, who are already facing foreclosure, are being deprived of any surplus monies arising from the auction of their homes.

56.    Further, and even more painfully, upon information and belief, the homeowners

who had no surplus were reported to the IRS for forgiveness of debt, subjecting them to additional liability after being foreclosed upon.

### III.    INDIVIDUAL PLAINTIFF FACTS: JOSE CALDERO

57.    Plaintiff Caldero is a person residing in Queens, New York.

58.    Before the occurrences giving rise to the instant complaint, Mr. Caldero resided at 76-05 267th Street, New Hyde Park, NY 11040 (hereinafter the "Caldero Subject Property.")

59.    On or about December 18, 2002, Mr. Caldero took out a mortgage on the Subject Property with non-party JP Morgan Chase Bank (hereinafter the "Caldero Subject Mortgage.")

60.    On or about January 24, 2017, a Notice of Pendency and Foreclosure Complaint was filed against Jose Caldero in the Supreme Court of the State of New York, County of Queens, under Index No. 701105/2017, seeking, *inter alia*, to foreclose on the Subject Property (hereinafter the "Caldero Foreclosure Action").

61.    On or about July 7, 2017, the Caldero Subject Mortgage was assigned to MLGTQ.

62.    On or about April 2, 2018, an order of reference was entered in the Caldero Foreclosure Action for a court-appointed referee to evaluate the Subject Property and the amounts due on the Caldero Subject Mortgage.

63.    On or about May 23, 2018, Robertson Anschutz appeared as co-counsel for MTGLQ.

64.    On or about August 7, 2018, the court-appointed referee, Kerry J. Katsorhis, Esq., submitted a Referee's Oath of Computation which incorporated and affirmed the amounts due and owing on the Caldero Subject Mortgage to be $321,122.29. Anthony D'Addona, a

foreclosure manager at Selene Finance, L.P., testified through an annexed affidavit that the principal balance of $258,223.56 remained on the Caldero Subject Mortgage. In addition, there was $33,591.85 due on accrued interest from November 1, 2015 through July 13, 2018, $172.27 due on accrued late charges, $29,716.20 due on "Escrow Advances," $854.00 due on "Corporate Advances," and $1,435.59 reduced from the total for a "Suspense Balance." As such, $321,122.29 remained outstanding on the Caldero Subject Mortgage as of July 13, 2018.

65.     On or about August 8, 2018, MLGTQ filed a notice of motion for a judgment of foreclosure and sale in the Caldero Foreclosure Action. Upon information and belief, attached to this motion was a proposed order drafted by Robertson Anschutz that was either identical or substantially similar to the JFS entered by the court on March 28, 2019.

66.     On or about March 28, 2019, the court granted MLGTQ's motion and entered a JFS, finding that $321,122.29 was due and owing on the Subject Mortgage.

67.     On or about June 28, 2019, the Caldero Subject Property was sold via public auction for $625,000.00, to non-parties Kirpal Singh and Manjit Singh.

### a.  Defendants' Improper Interest Calculations

68.     As discussed broadly, *supra*, a foreclosure action does not end immediately after the foreclosed property is sold. The court, through its appointed referee, must determine and distribute any surplus monies from the sale or, in the alternative, decide what deficiencies exist. After such computation is complete, a "Referee's Report of Sale" is filed with the court, outlining when the property was sold, how much it was sold for, how much is owed to the plaintiff to date and how much surplus monies or deficiencies are remaining.

69.     On or about August 2, 2019, the Referee's Report of Sale for the Caldero Foreclosure Action (hereinafter "Caldero Report of Sale") was filed with the court which

revealed the Defendants' fraudulent scheme.

70.     The Caldero Report of Sale proffered the following calculations used to determine how much was finally due and owing to MLGTQ.

STATEMENT

| | |
|---|---|
| AMOUNT DUE PER JUDGMENT | $321,122.29 |
| Interest thereon from 7/14/2018 to 3/28/2019 at 4.875 % | $11,065.62 |
| Interest thereon from 3/29/2019 to 8/1/2019 at 9 % | $9,976.68 |
| ADVANCES FOR ESCROW | $2,521.59 |
| OPEN TAXES | $1,628.58 |
| OPEN WATER/SEWER | $658.58 |
| TAXED COSTS AND DISBURSEMENTS | $1,309.06 |
| ADDITIONAL ALLOWANCE | $308.82 |
| ADVERTISING EXPENSES | $3,792.80 |
| REFEREE FEE | $500.00 |
| PROPERTY INSPECTIONS | $163.50 |
| ATTORNEY FEES | $1,531.62 |
| | |
| TOTAL DUE | $354,579.14 |
| PURCHASE PRICE | $625,000.00 |
| | |
| SURPLUS | $270,420.86 |

Dated: August 1, 2019

71.     As can be seen above, Defendants flagrantly utilize the amount awarded in the JFS on August 8, 2018 to compute the amount of interest owed during Motion Determination Period.

72.     Specifically, Defendants utilize the final judgment amount of $321,122.29, which already includes interest at the Caldero Subject Mortgage rate up until July 13, 2018, and

computes interest at the Caldero Subject Mortgage interest rate using the judgment amount as its basis instead of the principal.

73.    As discussed *supra*, the amount due and owing on a mortgage is not finally determined until a court enters a JFS. Only then is a final judgment awarded to a plaintiff, and only then can a plaintiff begin to compute interest occurring on the final judgment amount. Here, Defendants prematurely utilize the final judgment amount to compute the pre-judgment interest accrued.

**(Remainder of page left intentionally blank)**

74.     To be clear, the legal way to compute interest due and owing at the end of the

Caldero Foreclosure Action during the Motion Determination Period would be as follows:

| | |
|---|---:|
| Amount due on note and mortgage, as per judgment, together with interest to July 13, 2018, the date interest was calculated to in said Referee's Report | $321,122.29 |
| Interest from 07/14/18 to 3/28/19, date of judgment, to wit: $258,223.56 (principal amount due on note and mortgage) x 4.875% (interest rate on note and mortgage) = 12,588.40 (annual interest)/365 days = $34.49 (per diem) x 257 days = | $8,863.61 |
| Interest from 03/29/19 to 8/1/19, to wit: $321,122.29 (amount due per judgment) + $8,863.61 (interest accrued on principal during Motion Determination Period) = 329,985.90 x 9.0% (statutory interest rate per annum) = 29,698.73 (annual interest)/365 days = $81.37 (per diem) x 125 days = | $10,171.25 |
| ADVANCES FOR ESCROW | $2,521.59 |
| OPEN TAXES | $1,628.58 |
| OPEN WATER/SEWER | $658.58 |
| TAXED COSTS AND DISBURSEMENTS | $1,309.06 |
| ADDITIONAL ALLOWANCE | $308.82 |
| ADVERTISING EXPENSES | $3,792.80 |
| REFEREE FEE | $500.00 |
| PROPERTY INSPECTIONS | $163.50 |
| ATTORNEY FEES | $1,531.62 |
| **Total Due Plaintiff** | **$352,571.70** |
| Amount of Bid/Purchase Money | $625,000.00 |
| TOTAL SURPLUS | $272,428.30 |

75.     By utilizing Robertson Anschutz's improper calculation methods, MLGTQ was

awarded $354,579.14 instead of the correct amount of $352,571.70, or $2,007.44 more than it is

entitled to on the Caldero Subject Mortgage.

## IV.    INDIVIDUAL PLAINTIFF FACTS: ANNABELLE G. LEVIEN

76.     Plaintiff Levien is a person residing in Queens, New York.

77.     Before the occurrences giving rise to the instant complaint, Ms. Levien resided at 55-10 102nd Street, Apt. 1A-1 Corona, NY 11368 Block: 1939 Lot: 1002 (hereinafter the "Levien Subject Property.")

78.     On or about March 9, 2004, Ms. Levien executed a Consolidation, Extension, Modification Agreement with non-party Bank of America, N.A., which consolidated two previous mortgages to form a single lien on the Levien Subject Property (hereinafter the "Levien Subject Mortgage")

79.     Thereafter, on or about May 20, 2013, assigned the Levien Subject Mortgage was assigned to Nationstar Mortgage LLC.

80.     On or about July 31, 2015, a Notice of Pendency and Foreclosure Complaint was filed against Ms. Levien in the Supreme Court of the State of New York, County of Queens, under Index No. 708111/2015, seeking, *inter alia*, to foreclose on the Levien Subject Property (hereinafter the "Levien Foreclosure Action").

81.     On or about May 2, 2016, an order of reference was entered, which assigned a court-appointed referee to evaluate the Levien Subject Property and the amounts due on the Subject Mortgage.

82.     On or about July 18, 2016, the court-appointed referee, Nestor Diaz, Esq., submitted a Referee's Report of Amount Due which incorporated and affirmed the amounts due and owing on the Subject Mortgage to be $115,767.82. Takesha Brown, a document execution specialist at Nationstar Mortgage LLC, testified through an annexed "Affidavit of Amounts Due" that the principal balance of $92,541.42 remained on the Levien Subject Mortgage. In addition,

25

there was $18,469.16 in outstanding interest, $4,154.24 due in taxes and $603.00 due for property preservation and maintenance. As such, $115,767.82 remained outstanding on the Levien Subject Mortgage as of June 14, 2016.

83.     On or about December 17, 2016, Robertson Anschutz filed a notice of motion for a judgment of foreclosure and sale in the Levien Foreclosure Action.

84.     On or about January 27, 2017, the court granted Nationstar Mortgage LLC's motion and directed Robertson Anschutz to submit a judgment of foreclosure and sale.

85.     On or about September 29, 2017, the court granted Nationstar Mortgage LLC's entered a JFS, finding that $115,767.82 was due and owing on the Subject Mortgage. Upon information and belief, Robertson Anschutz drafted the submitted order that was either identical or substantially similar to the JFS entered by the court on September 29, 2017.

86.     On or about January 19, 2018, the Subject Property was sold via public auction for $320,000.00, to non-party Kakkar Prianka.

### b. Defendants' Improper Interest Calculations

87.     As discussed broadly, *supra*, a foreclosure action does not end immediately after the foreclosed property is sold. The court, through its appointed referee, must determine and distribute any surplus monies from the sale or, in the alternative, what deficiencies exist. After such computation is complete, a "Referee's Report of Sale" is filed with the court, outlining when the property was sold, how much it was sold for, how much is owed to the plaintiff to date, and how much surplus monies or deficiencies are remaining.

88.     On or about March 23, 2019, the Referee's Report of Sale for the Levien Foreclosure Action (hereinafter "Levien Report of Sale") was filed with the court which revealed the Defendants' fraudulent scheme.

89. The Levien Report of Sale proffered the following calculations used to determine how much was finally due and owing to Nationstar Mortgage LLC.

### STATEMENT

| | |
|---|---|
| AMOUNT DUE PER JUDGMENT | $115,767.82 |
| Interest thereon from 6/15/16 to 2/28/17 at 3.5% | $2,874.90 |
| Interest thereon from 3/1/17 to 9/29/17 at 4% | $2,702.97 |
| Interest thereon from 9/30/17 to 3/23/18 at 9% | $4,996.25 |
| ADVANCES FOR ESCROW | $4,317.91 |
| TAXED COSTS AND DISBURSEMENTS | $1,793.16 |
| ADVERTISING EXPENSES | $5,497.80 |
| REFEREE FEE | $500.00 |
| PROPERTY INSPECTIONS | $225.00 |
| ATTORNEY FEES | $6,500.00 |
| TOTAL DUE | $145,202.90 |
| PURCHASE PRICE | $320,000.00 |
| SURPLUS | $174,797.10 |

Dated: March 23, 2018

_____
NESTOR DIAZ, ESQ. REFEREE

90. As can be seen above, Defendants flagrantly utilize the amount awarded in the JFS on September 29, 2017 to compute the amount of interest owed during Motion Determination Period.

91. Specifically, Defendants utilize the final judgment amount of $115,767.82,

which already includes interest at the Levien Subject Mortgage rate up until June 23, 2016, and computes interest at the Levien Subject Mortgage interest rate using the judgment amount as its basis instead of the principal.

92.     As discussed *supra*, the amount due and owing on a mortgage is not finally determined until a court enters a JFS. Only then is a final judgment awarded to a plaintiff, and only then can a plaintiff begin to compute interest occurring on the final judgment amount. Here, Defendants prematurely utilize the final judgment amount to compute the pre-judgment interest accrued.

**(Remainder of page left intentionally blank)**

93.    To be clear, the legal way to compute interest due and owing at the end of the Levien Foreclosure Action during the Motion Determination Period would be as follows:

| | |
|---|---:|
| Amount due on note and mortgage, as per judgment, together with interest to June 14, 2016, the date interest was calculated to in said Referee's Report | $115,767.82 |
| Interest from 6/14/2016 to 2/28/17, date of judgment, to wit: $92,541.42 (principal amount due on note and mortgage) x 3.5% (interest rate on note and mortgage) = $3,238.95 (annual interest)/365 days = $8.87 (per diem) x 259 days = | $2,297.33 |
| Interest from 3/1/17 to 9/29/17, date of judgment, to wit: $92,541.42 (principal amount due on note and mortgage) x 4.0% (interest rate on note and mortgage) = $3,701.66 (annual interest)/365 days = $10.14 (per diem) x 212 days = | $2,149.68 |
| Interest from 9/30/17, as per judgment, to 3/23/18, date of closing, to wit: $115,767.82 (amount due per judgment) + 4,447.01 (interest accrued on principal during Motion Determination Period) = 120,214.83 x 9.00% (statutory interest rate per annum) =$10,819.33/365 days = $29.64 (per diem) x 174 days = | $5,157.36 |
| ADVANCES FOR ESCROW | $4,317.91 |
| TAXED COSTS AND DISBURSEMENTS | $1,793.16 |
| ADVERTISING EXPENSES | $5,497.80 |
| REFEREE FEE | $500.00 |
| PROPERTY INSPECTIONS | $225.00 |
| ATTORNEY FEES | $6,500.00 |
| **Total Due Plaintiff** | **$144,206.06** |
| Amount of Bid/Purchase Money | $320,000.00 |
| TOTAL SURPLUS | $175,793.94 |

94.    By utilizing Robertson Anschutz's improper calculation methods, Nationstar Mortgage was awarded $145,202.90 instead of the correct amount of $144,206.06, or $996.84 more than it is entitled to on the Levien Subject Mortgage.

## V.    INDIVIDUAL PLAINTIFF FACTS: YAMILET SALTY

95.    Plaintiff Salty is a person residing in Brooklyn, New York.

96.    Before the occurrences giving rise to the instant complaint, Ms. Salty resided at 197 Autumn Avenue, Brooklyn, New York 11208 (hereinafter the "Salty Subject Property.")

97.    On or about August 8, 2006, Yamil Salty and Rosaura Salty took out a mortgage on the Subject Property with non-party JP Morgan Chase Bank (hereinafter the "Salty Subject Mortgage").

98.    On or about June 30, 2010, the Salty Subject Mortgage was assigned to Mortgage Electronic Registration Systems, Inc. On or about August 20, 2014, the Salty Subject Mortgage was subsequently assigned to ("Fannie Mae").

99.    On or about March 27, 2015, a Notice of Pendency and Foreclosure Complaint was filed against Yamil Salty and Yamilet Salty in the Supreme Court of the State of New York, County of Kings, under Index No. 503568/2015, seeking, *inter alia*, to foreclose on the Subject Property (hereinafter the "Salty Foreclosure Action").

100.    On or about March 27, 2015, Sara Z. Boriskin, Esq. of Robertson Anschutz appeared as counsel for Fannie Mae.

101.    On or about July 20, 2016, an order of reference was entered in the Salty Foreclosure Action for a court-appointed referee to evaluate the Subject Property and the amounts due on the Salty Subject Mortgage.

102.    On or about November 21, 2018, the court-appointed referee, Dominic J. Famulari, Esq., submitted a Referee's Oath of Computation which incorporated and affirmed the amounts due and owing on the Salty Subject Mortgage to be $424,476.72. Wan-Il Lee, a

foreclosure manager at the defunct Seterus, Inc.,[7] testified through an annexed affidavit that the principal balance of $365,429.20 remained on the Salty Subject Mortgage. In addition, there was: $50,174.83 due on accrued interest from February 1, 2014 through January 20, 2017; $136.92 due on accrued late charges; $7,960.77 due on "Escrow Advances," and $775.00 due on "Corporate Advances". As such, $424,476.72 remained outstanding on the Salty Subject Mortgage as of January 20, 2017.

103.    On or about June 22, 2017, Fannie Mae filed a notice of motion for a judgment of foreclosure and sale in the Salty Foreclosure Action. Upon information and belief, attached to this motion was a proposed order drafted by Robertson Anschutz that was either identical or substantially similar to the JFS entered by the court on November 1, 2017.

104.    On or about November 1, 2017, the court granted Fannie Mae's motion and entered a JFS, finding that $424,476.72 was due and owing on the Subject Mortgage.

105.    On or about February 22, 2018, the Salty Subject Property was sold via public auction for $550,000.00, to non-party Gao Kong Shun.

### a. Defendants' Improper Interest Calculations

106.    As discussed broadly, *supra*, a foreclosure action does not end immediately after the foreclosed property is sold. The court, through its appointed referee, must determine and distribute any surplus monies from the sale or, in the alternative, decide what deficiencies exist. After such computation is complete, a "Referee's Report of Sale" is filed with the court, outlining when the property was sold, how much it was sold for, how much is owed to the plaintiff to date and how much surplus monies or deficiencies are remaining.

107.    On or about November 21, 2018, the Referee's Report of Sale for the Salty

---

[7] Seterus, Inc. was a mortgage servicing business which was acquired by Nationstar Mortgage in 2019. As such, Nationstar Mortgage is also sued herein for any and all acts committed by Seterus, Inc.

Foreclosure Action (hereinafter "Salty Report of Sale") was filed with the court which revealed the Defendant's fraudulent scheme.

108.    The Salty Report of Sale proffered the following calculations used to determine how much was finally due and owing to Fannie Mae:

STATEMENT

| | |
|---|---|
| AMOUNT DUE PER JUDGMENT | $424,476.72 |
| Interest thereon from 1/21/17 to 11/1/17 at 4.625% | $15,330.15 |
| Interest thereon from 11/2/17 to 11/21/18 at 9% | $40,297.95 |
| ADVANCES FOR ESCROW | ~~$21,560.61~~ 17,711.86 |
| OPEN TAXES | $444.40 |
| OPEN WATER/SEWER | $411.32 |
| TAXED COSTS AND DISBURSEMENTS | $1,730.15 |
| ADVERTISING EXPENSES | $3,581.53 |
| REFEREE FEE | $500.00 |
| ~~PROPERTY INSPECTIONS~~ | ~~$255.00~~ |
| ~~PROPERTY PRESERVATION~~ | ~~$660.00~~ |
| ~~APPRAISALS~~ TRANSFER TAXES (1/2) | ~~$255.00~~ 5,018.75 |
| TOTAL DUE | ~~$514,521.58~~ 509,502.88 |
| PURCHASE PRICE | $550,000.00 |
| SURPLUS | ~~$35,478.42~~ 40,497.17 |

Dated: November 21, 2018

Dominic J. Famulari, ESQ. REFEREE

109.    As can be seen above, Defendants flagrantly utilize the amount awarded in the JFS on November 1, 2017, to compute the amount of interest owed during Motion Determination Period.

110.    Specifically, Defendants utilize the final judgment amount of $424,476.72 which already includes interest at the Salty Subject Mortgage rate up until January 20, 2017, and computes interest at the Salty Subject Mortgage interest rate using the judgment amount as its basis instead of the principal.

111.    As discussed *supra*, the amount due and owing on a mortgage is not finally determined until a court enters a JFS. Only then is a final judgment awarded to a plaintiff, and only then can a plaintiff begin to compute interest occurring on the final judgment amount. Here, Defendants prematurely utilize the final judgment amount to compute the pre-judgment interest accrued.

**(Remainder of page left intentionally blank)**

112.    To be clear, the legal way to compute interest due and owing at the end of the

Salty Foreclosure Action during the Motion Determination Period would be as follows:

| | |
|---|---:|
| Amount due on note and mortgage, as per judgment, together with interest to January 20, 2017, the date interest was calculated to in said Referee's Report | $424,476.72 |
| Interest from 01/21/2017 to 11/01/2017, date of judgment, to wit: $365,429.20 (principal amount due on note and mortgage) x 4.625% (interest rate on note and mortgage) = $16,901(annual interest)/365 days = $46.30 (per diem) x 284 days = | $13,150.45 |
| Interest from 11/02/2017 to 11/21/2018, to wit: $424,476.72 (amount due per judgment) + $13,150.45 (interest accrued on principal during Motion Determination Period) = $437,627.17 x 9.0% (statutory interest rate per annum) = $39,386.45 (annual interest)/365 days = $107.90 (per diem) x 384 days = | $41,436.70 |
| ADVANCES FOR ESCROW | $17,711.86 |
| OPEN TAXES | $444.40 |
| OPEN WATER/SEWER | $411.32 |
| TAXED COSTS AND DISBURSEMENTS | $1,730.15 |
| ADVERTISING EXPENSES | $3,581.53 |
| REFEREE FEE | $500.00 |
| PROPERTY INSPECTION | N/A |
| PROPERTY PRESERVATION | N/A |
| APPRAISALS | N/A |
| TRANSFER TAXES (1/2) | $5,018.75 |
| **Total Due Plaintiff** | **$507,961.88** |
| Amount of Bid/Purchase Money | $550,000.00 |
| TOTAL SURPLUS | $42,497.17 |

113.    By utilizing Robertson Anschutz's improper calculation methods, Fannie Mae

was awarded $509,502.83 instead of the correct amount of $507,961.88; $1,540.95 more than it

is entitled to on the Salty Subject Mortgage.

## CLASS ALLEGATIONS

114.    This action is brought on behalf of Plaintiff individually and as a class action on behalf of the following class ("Class"):

> (a) all persons sued, or creditors of such persons or lienholders of liens against the property that was the subject of the foreclosure action in question, in state-court lawsuits related to the collection of debt owed on a mortgage loan document secured by real property, (b) that were sold at auction, (c) in which Robertson was identified as counsel for the plaintiff in the complaint, (d) within six years of the date of the filing of this action. Excluded from the Class are the officers and directors of any Defendant, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which any Defendant has or had a controlling interest, at all relevant times.

115.    While the exact number of Class members can only be determined through appropriate discovery, Plaintiff has reviewed the dockets of foreclosure actions prosecuted by Robertson and believes that there are hundreds of members of the Class.

116.    Plaintiff's claims are typical of the claims of the other members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct, as complained of herein.

117.    There are common questions of law and fact affecting members of the Class, which common questions predominate over questions that might affect individual members. These questions include, but are not limited to, the following:

      i.    Whether Defendants filed materially deceptive motions and documentation in connection with said lawsuits;

      ii.    Whether Plaintiff and the other members of the Class are entitled to damages, including punitive damages, costs, and/or attorneys' fees, for Defendants' acts and conduct as alleged herein, and the proper measure thereof.

      iii.    Whether the Defendants deprived the Plaintiff and other members of the Class of

surplus funds they were entitled via the deceptive filings

118.     Plaintiff will fairly and adequately represent the other members of the Class. Plaintiff has no interests that conflict with the interests of other Class members. Plaintiff has retained counsel competent and experienced in the prosecution of class action litigation.

119.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members might be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

120.     Members of the Class can be identified from records maintained by Defendants, and can be notified of the pendency of this action by United States mail using a form of notice customarily used in similar class actions.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(FAIR DEBT COLLECTION PRACTICES ACT)**
***(Against All Defendants)***

121.     Plaintiffs repeat and re-allege each and every paragraph set forth above as though fully set forth herein.

122.     Plaintiffs are "consumer[s]," as that term is defined by the Fair Debt Collection Practices Act ("FDCPA"), *see* 15 U.S.C. § 1692a(3). MLGTQ and Selene Finance are "debt collectors," as that term is defined by the FDCPA, *see* 15 U.S.C. § 1692a(6).

123.     The FDCPA was enacted to stop "the use of abusive, deceptive, and unfair debt collection practices by many debt collectors." 15 U.S.C. § 1692(a).

124.     The FDCPA identifies sixteen specific, nonexclusive prohibited debt collection

practices, and generally prohibits a debt collector from "us[ing] any false, deceptive, or misleading representation or means in connection with the collection of any debt." Among the acts prohibited are: the false representation of "the character, amount, or legal status of any debt," 15 U.S.C. § 1692e(2)(A); "[t]he false representation or implication . . . that any communication is from an attorney[,]"15 U.S.C. § 1692e(3); "[t]he threat to take any action that cannot legally be taken or that is not intended to be taken[,]" 15 U.S.C. § 1692e(5); "[c]ommunicating . . . credit information which is known or which should be known to be false[,]" 15 U.S.C. § 1692e(8); and "[t]he use of any false representation or deceptive means to collect or attempt to collect any debt[,]" 15 U.S.C. § 1692e(10).

125.    The FDCPA also prohibits debt collectors from "us[ing] unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f.

126.    Defendants violated the FDCPA by making false and misleading representations, using deceptive means and engaging in unfair and abusive practices. Defendants' violations include, but are not limited to, the following:

    i.    Filing deceptive motions and documentation in foreclosure actions against Plaintiff and the other members of the class, as described herein, that were fraudulent and misleading in that they were drafted, reviewed and submitted to a court with the understanding that the interest calculations contained therein illegally inflated the amount of monies due and owing to Defendants;

    ii.    Filing motions and referees' reports of sale as described herein, that were fraudulent, deceptive and misleading in that they were drafted, reviewed and submitted to a court with the understanding that the interest calculations contained therein illegally inflated the amount of monies due and owing to

Defendants;

iii.  Collecting monies incidental to the principal obligations under mortgage loan agreements without being expressly authorized by the original mortgage loan agreement to do so.

127.  The acts and practices herein set forth were deceptive, misleading, and fraudulent.

128.  Plaintiffs and the Class members have been damaged as a result of these violations, and are entitled to relief as provided for by 15 U.S.C. § 1692k.

## AS AND FOR A SECOND CAUSE OF ACTION
### (N.Y. GEN. BUS. LAW § 349)
### (*Against All Defendants*)

129.  Plaintiffs repeat and re-allege each and every paragraph set forth above as though fully set forth herein.

130.  Plaintiffs are New York consumers entitled to the protection afforded under Article 22-A of the General Business Law ("GBL"), entitled "Consumer Protection from Deceptive Acts and Practices."

131.  GBL § 349 provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York] are hereby declared unlawful."

132.  A GBL § 349 cause of action accrues when consumer-oriented conduct would be deceptive and materially misleading to a reasonable consumer and causes damages.

133.  Defendants' acts and omissions are directed at consumers and include, but are not limited to:

i.  Filing deceptive motions and documentation in foreclosure actions against

38

Plaintiffs and the other members of the Class, as described herein, that were fraudulent and misleading in that they were drafted, reviewed and submitted to a court with the understanding that the interest calculations contained therein illegally inflated the amount of monies due and owing to Defendants;

ii. Filing motions and referees' reports of sale as described herein, that were fraudulent, deceptive and misleading in that they were drafted, reviewed and submitted to a court with the understanding that the interest calculations contained therein illegally inflated the amount of monies due and owing to Defendants.

134. The acts and practices herein set forth were deceptive, misleading, and fraudulent. As a result of such practices, Plaintiffs and the other members of the Class were injured, suffered damages, and are entitled to relief as provided for by GBL § 349(h).

<u>**AS AND FOR A THIRD CAUSE OF ACTION**</u>
**(VIOLATIONS OF NEW YORK JUDICIARY LAW § 487)**
**(*Against Robertson*)**

135. Plaintiffs repeat and re-allege each and every paragraph set forth above as though fully set forth herein.

136. New York Judiciary Law § 487 provides as follows: "An attorney or counselor who . . . [i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party . . . [i]s guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action."

137. As set forth above, Robertson violated New York Judiciary Law § 487 by engaging in a chronic, persistent pattern of conduct with the intent to deceive consumers and

multiple New York courts. Robertson's violations include, but are not limited to:

     i.    Filing deceptive motions and documentation in foreclosure actions against Plaintiffs and the other members of the Class, as described herein, that were fraudulent and misleading in that they were drafted, reviewed and submitted to a court with the understanding that the interest calculations contained therein illegally inflated the amount of monies due and owing to Defendants;

    ii.    Filing motions and referees' reports of sale as described herein, that were fraudulent, deceptive and misleading in that they were drafted, reviewed and submitted to a court with the understanding that the interest calculations contained therein illegally inflated the amount of monies due and owing to Defendants.

138.    As a result of Robertson's deceitful and fraudulent conduct, Plaintiffs and the other members of the Class have been injured. Plaintiffs and the Class are entitled to relief, as provided for by New York Judiciary Law § 487, in an amount to be determined at trial.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**(CIVIL RICO, 28 U.S.C. § 1962(c) & (d))**
***(Against All Defendants)***

139.    Plaintiff hereby restates, re-alleges, and incorporates by reference all foregoing paragraphs.

140.    Plaintiff is a natural person, and as such is a "person" within the meaning of 18 U.S.C. § 1961(3).

141.    Defendants are natural persons and corporate entities, and as such are "persons" within the meaning of 18 U.S.C § 1961(3).

## I.    THE ENTERPRISE

142.    Upon information and belief, MGPTQ, Fannie Mae amd Nationstar Mortgage LLC, the John and Jane Doe Investors 1-10, Selene Finance and Robertson (including John and Jane Does 1-10) comprise four distinct groups of persons that together form an Enterprise, as defined *infra*, within the meaning of 18 U.S.C. § 1961(4). Each and every defendant is employed by or associated with the Enterprise.

143.    Upon information and belief, each defendant, MLGTQ, Fannie Mae and Nationstar Mortgage LLC, the John and Jane Doe Investors 1-10 and Selene Finance and Robertson, also qualify as separate and distinct enterprises within the meaning of U.S.C. § 1961(4). Each and every Defendant has organized themselves and the Enterprise into a cohesive group with specific and designated responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts.

144.    Upon information and belief, the individuals and entities that constitute MLGTQ, Fannie Mae and Nationstar Mortgage LLC, Selene Finance, Robertson, and the John and Jane Doe Investors 1-10 taken together are an association-in-fact within the meaning of 18 U.S.C. § 1961(4).

145.    The purpose of the enterprise and/or enterprises (collectively "Enterprise") is to secure judgments of foreclosure and sale through fraudulent means and to use those judgments to extract money from Plaintiffs and punitive Class members. This is accomplished by the John and Jane Doe Investors 1-10, MLGTQ, Fannie Mae and Nationstar Mortgage LLC and Selene Finance buying debts for collection; then Robertson commencing action in the Supreme Court of the State of New York or federal court on behalf of the MLGTQ, Fannie Mae and Nationstar Mortgage LLC and Robertson providing fraudulent reports of referee of sale in furtherance of the

scheme. The relationships between the three defendants groups are longstanding and ongoing.

146.    The Enterprise has for many, but no fewer than six years, have been engaged in, and continues to be engaged in, activities that affect interstate commerce. Defendants' unlawful Enterprise is in violation of RICO has been and remains longstanding, continuous and open ended.

## II.    PATTERN OF RACKETEERING ACTIVITY

147.    Defendants, individually and collectively, as an Enterprise, have engaged, directly or indirectly, in a pattern of racketeering activity, as described below, in violation of 18 U.S.C. § 1962(c) & (d).

148.    Defendants, acting individually and as part of the Enterprise, have devised a scheme to defraud and obtain money or property by means of false or fraudulent pretenses and representations. The scheme includes but is not limited to:

   i.    Producing and filing fraudulent motions for a judgment of foreclosure and sale;

   ii.    Producing and filing fraudulent Referee Reports of Sale;

   iii.    Using fraudulent, deceptive and misleading Referee Reports of Sale to obtain Judgments of Foreclosure and Sale against Plaintiffs and Class members under false pretenses;

   iv.    Using fraudulently obtained judgments of foreclosure and sale to steal surplus monies from Plaintiffs and Class members.

149.    Defendants, acting individually and as part of the Enterprise, have made fraudulent misrepresentations on specific as follows.

   i.    On August 8, 2019, August 2, 2019, December 17, 2016, September 29, 2017 and March 23, 2018, Defendants submitted fraudulent filings, as described

herein, with the Supreme Court of the State of New York, Queens County, falsely claiming that MLGTQ, Fannie Mae and Nationstar Mortgage are entitled to illegally computed compound interest.

150.    The fraudulent misrepresentations listed above involving the individually named Plaintiffs are described in more details in paragraphs 57 to 113 of this Complaint.

151.    Defendants, acting individually and as part of the Enterprise, have utilized these deceptive court filings with every JFS that they have fraudulently obtained, and each use of the deceptive court filings has furthered the fraudulent scheme and enabled Defendants to take money and property from Plaintiffs and putative Class members by reasons of false pretenses and representations.

152.    Further, after the winning bidder becomes the owner of the property, the Defendants have used wires and the mail to receive the unlawfully obtained monies. The Enterprise's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1). The Enterprise's repeated and continuous use of such conduct to participate in these affairs constitutes a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

153.    Upon information and belief, each and every defendant has specific knowledge that deceptive court filings are being utilized in furtherance of the overall purpose of executing the scheme to defraud, and/or it was reasonably foreseeable that deceptive court filings would be used to deprive Plaintiff and other Class members of their personal property. Indeed, no JFS or proceeds from a foreclosure sale can be obtained without these deceptive court filings.

154.    Each of the of deceptive court filings submitted in connection with Defendants' schemes to defraud spanning a period of no fewer than six years, constitutes a separate instance

of fraud within the meaning of 18 U.S.C §§ 1341 and 1343, thus a predicate act, which, taken together, constitutes "a pattern of racketeering activity" within the meaning of 18 U.S.C. §§ 1961 and 1962.

155.    In connection with Defendants' schemes, the acts of racketeering activity have occurred after the effective date of the RICO statute, 18 U.S.C. § 1961 et seq., and on countless occasions over a substantial time period within ten years of each other. The acts of racketeering are an ongoing part of Defendants' regular way of doing business. The predicate acts have been and will be repeated over and over again.

## III.    RELATIONSHIP OF PATTERN OF RACKETEERING ACTIVITY TO ENTERPRISE

156.    As described, the goal of Defendants' Enterprise is to obtain a JFS through fraudulent means and to use those judgments to extract money and property from Plaintiffs and putative Class members.

157.    The pattern of racketeering activity described above is integral to Defendants' scheme. Without submitting these deceptive court filings, Defendants would be unable to obtain the monies they seek.

158.    Each Defendant, individually and as a member of the Enterprise, has conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs through the pattern of racketeering activity described above. Accordingly, each defendant has violated 18 U.S.C. § 1962(c).

159.    Moreover, each Defendant, has knowingly agreed and conspired to violate the provisions of 18 U.S.C. § 1962(c), including the numerous predicate acts of fraud described above, and also violation of 10 U.S.C. § 921 (Larceny), N.Y. Judiciary Law § 487 (Deceptive Acts by Attorneys), N.Y. Penal Law § 155 (Larceny), and has thus violated 18 U.S.C § 1962(d).

160.    As a direct and proximate result of the RICO violations described in this Complaint, Plaintiffs and putative Class members have suffered substantial injuries. Plaintiffs and putative Class members have been deprived of due process and have had foreclosure and sale judgments entered against them which have been used to extract money from them by selling their property, thus constituting an injury to Plaintiffs' property within the meaning of 18 U.S.C. § 1964, by the actions of Defendants and their co-conspirators in violation of 18 U.S.C. § 1962(c) & (d).

161.    Defendants' misrepresentations to the courts secured the judgments of foreclosure and sale that caused concrete injury to Plaintiff's property. As a result, Plaintiffs have suffered damage to their property within the meaning of 18 U.S.C. § 1964, by the actions of Defendants and their co-conspirators in violation of 18 U.S.C. § 1962(c) & (d).

162.    Defendants' conduct has involved and continues to pose a threat of long term criminality since it is believed to have commenced as long as a decade ago and has continued to the present. The pattern of racketeering activity has been directed towards hundreds of thousands of persons, including Plaintiffs, and the pattern has spanned many years.

163.    For the violations of 18 U.S.C. § 1962 described in this Complaint, Plaintiffs are entitled to recover compensatory and treble damages in an amount to be determined at trial, and to a prospective order directing Defendants to disgorge their ill-gotten gains in order to deter them from engaging in similar conduct in the future.

164.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

165.    Specifically, members of the Enterprise maintain offices in New York and use personnel in these offices to originate, underwrite, fund, assign, service and collect upon

mortgages made or purchased by the Enterprise to entities throughout the United States via extensive use of interstate emails, mail, wire transfers and withdrawals processed through an automated clearing house.

166. In the present case, all communications between the members of the Enterprise, were by interstate email, mail, online state and federal court portals (New York State Courts Electronic Filing or the Federal Case Management/Electronic Court Filing System), wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails and court portals to submit the fraudulent court filings discussed *supra.*

167. In addition, at the direction of Defendants, each of the alleged fraudulent court filings listed *supra* were sent from outside of New York to Enterprise offices within New York via Federal Express or United States Postal Service to either be manually filed in the relevant County Clerk's office or through online court portals (New York State Courts Electronic Filing or the Federal Case Management/Electronic Court Filing system).

## IV. INJURY AND CAUSATION

168. Plaintiffs have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c).

169. The injuries to Plaintiffs were directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands of dollars in improperly collected surplus monies and the unlawful entry and enforcement of judgments.

170. Plaintiffs have also suffered damages by incurring attorney's fees and costs associated with exposing and prosecuting Defendants' criminal activities.

171. Pursuant to 18 U.S.C. 1964(c), Plaintiffs are entitled to treble damages, plus

costs and attorney's fees from Defendants.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Negligence)
### (*Against Robertson*)

172.    Plaintiffs repeat and re-allege each and every paragraph set forth above as though fully set forth herein.

173.    Robertson entered into a retainer agreement with MLGTQ and Nationstar Mortgage to perform legal work, which included writing and filing motions and other documents in the Caldero and Levien Foreclosure Actions.

174.    Robertson was responsible for the means and methods of its work.

175.    Upon information and belief, Robertson instructs its attorneys and employees to calculate interest with the fraudulent method described herein via a pre-written and approved manual containing a step-by-step guide to be followed by every employee and agent of Robertson.

176.    Robertson decided to use proposed orders and referee reports of sale with a miscalculated judgment amount.

177.    Robertson failed to take available basic and necessary steps to properly calculate the final judgment amounts included in its submissions to the court. By entering into a retainer agreement to render services, Robertson assumed a duty to exercise reasonable skill in the performance of its work.

178.    Furthermore, Robertson failed to take available basic and necessary steps to properly report sales of the foreclosed properties, resulting in sales that are lower in price than the bid amount at auction.

179.    Robertson breached its duty to exercise reasonable skill and care in the course of

discharging its contractual obligations and thereby launched a force of instrument of harm.

180.    Robertson knew, or should have known, that its failure to properly calculate the judgment amounts for the referee reports of sale could lead to Plaintiffs being charged unlawful, compound interest that vastly inflated the amounts owed to the foreclosing defendants.

181.    By reason of the foregoing, Robertson directly created and/or increased the risk of harm to Plaintiffs.

182.    As a direct, proximate cause of the foregoing, Plaintiffs have been damaged in the total amount to be determined at trial, but no less than $5,000,000.00.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (GROSS NEGLIGENCE)
#### (*Against Robertson*)

183.    Plaintiffs repeat and reallege each and every paragraph set forth above as though fully set forth herein.

184.    By reason of the foregoing, Robertson's failure to follow the basic and necessary protocol for the calculations in the referee reports of sale manifested a reckless and intentional breach of its duty of care and a complete disregard for the rights of Plaintiffs.

185.    Furthermore, Robertson failed to take available basic and necessary steps to properly report sales of the foreclosed properties, resulting in sales that are lower in price than the bid amount at auction.

186.    As a direct, proximate and foreseeable result of Robertson's gross negligence, Plaintiffs have been damaged in the total amount of no less than $5,000,000.00.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### (LEGAL MALPRACTICE)
#### (*Against Robertson*)

187.    Plaintiffs repeat and re-allege each and every paragraph set forth above as though fully set forth herein.

188.     Robertson negligently and recklessly filed fraudulent referee reports of sale on behalf of MLGTQ and Selene Financial, knowing it did not have personal knowledge of the facts necessary to secure a judgment of foreclosure of sale.

189.     Furthermore, Robertson failed to take available basic and necessary steps to properly report sales of the foreclosed properties, resulting in sales that are lower in price than the bid amount at auction.

190.     Robertson's negligent and reckless filing of fraudulent referee reports of sale and the circumstances under which Robertson's negligent acts were committed, as aforesaid, caused Plaintiffs and Class members to suffer a loss of security, collateral and interest in their properties.

191.     As a direct, proximate and foreseeable result of Robertson's legal malpractice, Plaintiffs have been damaged in the  total amount of no less than $5,000,000.00

### AS AND FOR AN EIGHT CAUSE OF ACTION
**(UNJUST ENRICHMENT)**
**(*Against MLGTQ, Fannie Mae and Nationstar Mortgage* )**

192.     Plaintiffs repeat and re-allege each and every paragraph set forth above as though fully set forth herein.

193.     That MLGTQ, Nationstar Mortgage, and Fannie Mae through Defendants fraudulent interest calculations, received $2,007.44, $996.84 and $1,540.95, respectively, more than they were legally entitled, to the detriment of Plaintiffs.

194.     Had the Defendants properly calculated the interest owed on the Caldero, Levien and Salty Subject Mortgages, Plaintiffs, or their creditors, would have been entitled to surplus monies resulting from the sales of the foreclosed properties discussed above.

195.     The Defendants have been unjustly enriched through these fraudulent activities. It is against equity and good conscience to permit the Defendants to retain the benefits of the

monies obtained without paying value to Plaintiffs.

196.    As a direct, proximate and foreseeable result of the Defendants' unjust enrichment, Plaintiffs have been damaged in the total amount of no less than $5,000,000.00.

## AS AND FOR A NINTH CAUSE OF ACTION
### (in the alternative - PRIMA FACIE TORT)
#### (*Against All Defendants*)

197.    Alternatively, Plaintiffs repeat and re-allege each and every paragraph set forth above as though fully set forth herein.

198.    Defendants, by and through their miscalculations of interest owed and reduction of the bid, intentionally sought to reduce and/or eliminate the surplus monies rightfully owed to Plaintiffs.

199.    As a result, Plaintiffs suffered damages in the form of lost surplus monies.

200.    Defendants had neither excuse nor justification for the miscalculations.

201.    As a direct, proximate and foreseeable result of the Defendants' conduct, Plaintiffs have been damaged in the total amount of no less than $5,000,000.00.

## TOLLING OF THE STATUTES OF LIMITATIONS

I.    **DISCOVERY RULE TOLLING**

202.    Plaintiffs could not have discovered, through the exercise of reasonable diligence, within the time periods of the statutes of limitation for the FDCPA and GBL § 349, that Defendants had perpetrated their fraudulent scheme against them.

203.    Plaintiffs did not know, and could not have known, essential elements of their claims until discussing this matter with an attorney in 2024, including that Defendants have (1) with intent of fabricating interest owed to the foreclosing lenders, and (2) submitted referee reports of sale where the amounts purported to be due are inaccurate.

204.    Therefore, the running of these statutes of limitations have been suspended with

respect to any claims that Plaintiffs and the other members of the Class have as a result of Defendants' fraudulent scheme by virtue of the discovery rule doctrine.

## II.    FRAUDULENT CONCEALMENT TOLLING

205.    Throughout the time period relevant to this action, Defendants affirmatively concealed from Plaintiffs and the other members of the Class the fraudulent scheme described herein. As such, neither Plaintiffs nor the other members of the Class could have discovered, even upon reasonable exercise of diligence that Defendants had secured judgments of foreclosure and sale against them through the fraudulent scheme described herein.

206.    Therefore, the running of the applicable statutes of limitations have been suspended until February 14, 2024, by virtue of the fraudulent concealment doctrine, with respect to any FDCPA and GBL § 349 claims that Plaintiffs and the other members of the Class have as a result of Defendants' fraudulent scheme.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff on behalf of herself and all others similarly situated, demand judgment as follows:

1.    An order certifying this case as a class action under Fed. R. Civ. P. 23;

2.    A judgment declaring that Defendants have committed the violations of law alleged in this action;

3.    An order enjoining and directing Defendants to comply with the NY CPLR in their debt collection activities, including without limitation:

    i.    Directing Defendants to cease engaging in debt collection practices that violate the FDCPA, RICO, NY GBL § 349 and NY Jud. Law § 487;

    ii.    Directing Defendants to review carefully the necessary documents to

prepare the referee reports of sale.

    iii.    Directing Defendants to properly calculate the interest from the time of the filing of the judgment of foreclosure and sale and the time it is entered.

4.    Actual and/or compensatory damages against all Defendants in an amount to be proven at trial;

5.    Treble damages pursuant to RICO;

6.    Statutory damages pursuant to the FDCPA;

7.    An order awarding disbursements, costs, and attorney's fees pursuant to the FDCPA, RICO, AND NY GBL § 349;

8.    Treble damages pursuant to NY Jud. Law § 487; and

9.    Such other and further relief that may be just and proper.

Dated:    Kew Gardens, New York
            April 2, 2025

                       Respectfully submitted,
                       **ANDERSON, BOWMAN & WALLSHEIN, PLLC**

                       By:  */s/ Mark S. Anderson, Esq. /s/*
                          Mark S. Anderson, Esq.
                          Kimberly Wroblewski, Esq.
                     80-02 Kew Gardens Road, Suite 600
                     Kew Gardens, New York 11415
                     Tel: (718) 263-6800
                     Fax: (718) 520-9401
                     Email: manderson@sbagk.com